UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| In re:  Kenneth S. Johnson, Jr. and Debra L. Johnson, <br><br>Debtors<br>_____<br><br>Kenneth S. Johnson, Jr. and Debra L. Johnson,<br><br>Plaintiffs,<br>v.<br><br>Department of Education, *et al.*<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 15-20113-drd7 <br><br><br><br><br><br><br><br>Adversary No. 15-02004-drd |

MEMORANDUM OPINION

Kenneth S. Johnson, Jr. and Debra L. Johnson (collectively, the "Debtors", appearing *pro se*) filed a complaint seeking a determination that their student loan debt ("Student Loans") owed to the Department of Education, Navient Solutions, Inc. ("Navient") and Educational Credit Management Corporation ("ECMC") (collectively, the "Defendants") is dischargeable pursuant to 11 U.S.C. §523(a)(8) on the ground that repayment of such debt would impose an undue hardship upon them.  The Defendants deny this allegation.  This is a core proceeding under 28 U.S.C. §157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§1334(b), 157(a) and 157(b)(1).  The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  For the reasons that

1

follow, the Court finds that the Debtors have failed to satisfy their burden of showing that their debts to the Defendants should be discharged.

## I. FACTUAL BACKGROUND

Kenneth Johnson is a 56 year-old father and grandfather, and Debra Johnson is a 53 year-old mother and grandmother. For the past 17 years, the Johnsons raised their grandson and granddaughter. Currently, their 18 year-old grandson has yet to graduate high school and remains a dependent in their home. Mr. Johnson works part-time at Schreiber Foods, a local market, while Mrs. Johnson works full-time as an Outpatient Accounts Coordinator at Compass Community Behavioral Health, Inc.

Between 1985 and 2011, the Debtors received multiple guaranteed student loans from the Defendants to fund their education at Liberty University. Neither Debtor obtained a degree. Mrs. Johnson testified that the reason for not graduating was that they "ran out of available funds."

Mr. Johnson currently has six student loans with the Department of Education and four student loans with ECMC. Mrs. Johnson currently has two student loans with the Department of Education.[1]

In August of 2014, Mr. Johnson applied for and received a financial hardship deferment of student loans from the Department of Education totaling $23,878 in principal and interest. In October of 2014, he applied for and received a financial hardship deferment of the ECMC loans totaling $8,501 in principal and interest. The following month, Mrs. Johnson consolidated her loans totaling $76, 816 in principal and interest, and received a financial hardship deferment as

---

[1] The Debtors had additional student loans, but they were consolidated with others in an attempt to reduce the number of loans.

well. The Debtors filed for bankruptcy under Chapter 7 on February 11, 2015, and this adversary proceeding followed.

The Certificate of Indebtedness prepared by the Department of Education indicates that as of March 18, 2015, Mr. Johnson was indebted to it in the principal amount of $22,865.02, with unpaid accrued interest of $1,144.91. Mrs. Johnson was indebted to the Department of Education in the principal amount of $74,003.63 with unpaid accrued interest of $3,2251.64. Neither Mr. Johnson nor Mrs. Johnson has made a single payment on their loans. In their answers to interrogatories, the Debtors state that the total amount of student loan debt is $109,195.

## II.   DISCUSSION

### A.   Undue Hardship

Under § 523(a)(8), certain student loans are nondischargeable unless repayment of the loan would impose an undue hardship on the debtors or their dependents. The burden of establishing undue hardship is on the debtor, and a preponderance of the evidence standard is applicable. *Ford v. Student Loan Guarantee Foundation of Arkansas (In re Ford)*, 269 B.R. 673, 675 (B.A.P. 8th Cir. 2001). The burden is often described as "rigorous." *See, e.g.*, *In re Nielsen*, 473 B.R. 755, 759 (8th Cir. BAP 2012), *aff'd* 502 Fed. Appx. 634 (8th Cir. 2013)(citations omitted).

The Bankruptcy Code contains no definition of the phrase "undue hardship" and interpretation of the concept has been left to the courts. In this Circuit, the applicable standard is the "totality of the circumstances" test. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003); *see also, Fahrer v. Sallie Mae Servicing Corp. (In re Fahrer)*, 308 B.R. 27, 32 (Bankr. W.D. Mo. 2004). In applying this approach, the courts are to consider: (1) the

debtor's past, current and reasonably reliable future financial resources; (2) the reasonable and necessary living expenses of the debtor and the debtor's dependents; and (3) other relevant facts and circumstances unique to the particular case. *Long*, 322 F.3d at 544. The principal inquiry is to determine whether "the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt – while still allowing for a minimal standard of living;" if so, the indebtedness should not be discharged. *Long*, 322 F.3d at 554. *See also In re Andresen,* 232 B.R. 127, 139 (B.A.P. 8th Cir. 1999)(the court must determine "whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on her student loan without reducing what the debtor and her dependents need to maintain a minimal standard of living"). A minimal standard of living requires that the debtor have sufficient financial resources to satisfy needs for food, shelter, clothing and medical treatment. *In re Nielsen*, 473 B.R. at 760.

The "totality of the circumstances" is obviously a very broad test, giving the Court considerable flexibility. As a result, courts in the Eighth Circuit have looked to a number of facts and circumstances to assist them in making this determination including: (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether the debtor has a permanent or long-term disability; (6) the ability of the debtor to obtain gainful employment in the area of study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness. *Vermaas v. Student Loans of North Dakota (In re Vermaas)*, 302 B.R. 650,

4

656-57 (Bankr. D. Neb. 2003); *Morris v. Univ. of Arkansas*, 277 B.R. 910, 914 (Bankr. W.D. Ark. 2002). The Eighth Circuit has also held that the availability of an income contingent repayment plan is an important factor to take into account. *See In re Nielsen*, 473 B.R. at 760. The Court will examine the relevant factors separately.

B. Analysis of the Totality of the Circumstances

### 1. Past, Present and Reasonably Reliable Future Financial Resources

The first factor the Court must consider is the Debtors' past, present and reasonably reliable future financial resources. Mr. Johnson currently works 28 hours/week at a local food market earning $12.55/hour, resulting in monthly gross income of $1,522.73 and monthly net income of approximately $1,288.82.[2] His employment there began on August 14, 2015. Mr. Johnson testified that he does not anticipate working full-time.[3] Mr. Johnson previously worked at ProEnergy Crafts, Inc. Paystubs demonstrate that his weekly gross pay averaged $450, translating into monthly gross income of roughly $1,800.

Mrs. Johnson works full-time in administration at a health care facility earning $11.89/hour, resulting in gross monthly income of $2,060.93 (with no overtime) and net monthly income of approximately $1,478.53.[4] She testified that the company does not give merit raises and she rarely works overtime, so she expects her employment income to remain the same.[5]

---

[2] These figures were provided by the Debtors in a trial exhibit. The figures provided by the Defendants at trial differ slightly: monthly gross income of $1,526.14 and monthly net income of $1,277.78.

[3] The record reflects that Mr. Johnson has worked full-time before, and as noted below, there is nothing to prevent him from engaging in full-time employment now.

[4] These figures were provided by the Debtors in a trial exhibit. Again, the figures provided by the Defendants differ: monthly gross income of $2,251.27 and monthly net income of $1,611.92. The variance is attributed, in large part, to the fact that the Defendants included overtime pay, and did not include the deductions for 401K contributions.

[5] Contrary to her statements, Mrs. Johnson's paystubs establish that she regularly works overtime.

The Debtors introduced evidence at trial indicating that their combined current gross monthly income totaled $3,583.66, or an annual income of $43,003.92. Their net monthly and annual income totaled $2,767.35 and $33,208.20, respectively. Mrs. Johnson's monthly gross income figure did not include overtime pay.[6]

Although Mr. Johnson testified that he does not expect to work full-time, he admitted on cross-examination that he would accept full-time employment at the food market if it was offered to him. The Defendants introduced a Pay Advice into evidence that shows an annual salary of $26,104 for full-time employment at the food market. Mr. Johnson also testified that the medications he was taking do not negatively affect his ability to work and admitted that he was capable of working more hours, especially since he is no longer responsible for caring for his grandchildren. With respect to Mrs. Johnson's employment income, the Defendants introduced pay stubs establishing that she did indeed earn overtime pay on a recurring basis, more than the infrequent times about which she testified. In fact, out of the nine pay periods represented by the pay stubs, Mrs. Johnson worked overtime during six of them, earning additional income of $180. In addition, the pay stubs indicate that she earned $190.24 in additional income for working during holidays. Although the Court cannot predict Mrs. Johnson's work schedule in the future, given her employment history, it is reasonable to assume that she will continue to earn overtime pay on a regular basis.

In addition, Mr. Johnson testified that he would earn $900 per month in social security benefits if he retired at age 63 and $1,035 per month if he retired at age 65. Mrs. Johnson's projected social security income upon retirement at age 65 is $1,065.

---

[6]These figures differ from those listed in Schedule I because at the time it was filed, Mr. Johnson was not employed. Therefore, Schedule I reflects zero income for him, and a combined monthly income of $1,715 (consisting of Mrs. Johnson's monthly take-home of $1,608 with no overtime pay plus $107 of food stamps).

6

In light of the evidence regarding Mr. Johnson's ability to work additional hours, their anticipated social security income, and Mrs. Johnson's probability of working overtime, the Court finds that the Debtors are not maximizing their earnings potential and that their financial picture is likely to improve.

**2. Reasonable and Necessary Living Expenses**

According to Schedule J, the Debtors' monthly expenses total $1,715:

| | |
|---|---|
| Rental | $575 |
| Electricity, heat, gas | $160 |
| Telephone, internet, cable | $267 |
| Food, housekeeping | $417 |
| Clothing, laundry | $ 25 |
| Personal care | $ 30 |
| Medical, dental | $ 30 |
| Transportation | $150 |
| Vehicle insurance | $ 61. |

The Debtors noted that they expected an increase in expenses once Mr. Johnson became employed.

At trial, the Debtors introduced an amended budget of $2,706 in expenses; the Department of Education introduced a suggested budget of $1,974. Mrs. Johnson testified at trial that she and her husband "don't live lavishly" -- they "live averagely." In essence, the Court agrees. However, the Court will address those expenses with which the Defendants take issue as well as its own concerns.

The Debtors listed their actual monthly rental expense at $775. To establish that their rent was excessive, the Department of Education offered testimony from a paralegal from the U.S. Attorney's Office who conducted research on rental properties in Clinton, Missouri, where the Debtors reside.[7] She testified that the average monthly rental for a two or three bedroom

---

[7]In August of 2014, Mr. Johnson lost his job. That led to the loss of his home and prompted the move to Clinton, Missouri.

house was between $450-$550 (as opposed to the $775 monthly rental paid by the Debtors). She admitted on cross-examination, however, that she did not take into account the qualifications of the renter (*i.e.*, what the rent would be for an applicant with bad credit). The Court does not find her testimony persuasive, and concludes that the rent paid by the Debtors is reasonable.

The Debtors' budget includes $100 per month for a "Desired Retirement Contribution." The Debtors contend that this budget item is necessary due to the fact that Mr. Johnson does not receive a retirement benefit through his employment.[8] The Department of Education contends that saving for retirement to the detriment of creditors is incompatible with the undue hardship standard, citing *In re Bakken*, 2015 WL 351924, *9 (Bankr. D. N.D. Jan. 23, 2015)(citations omitted). In that case, the issue was whether the debtor made a good faith effort to minimize expenses; the court held that the fact that the debtor made a retirement contribution alone does not indicate a failure to minimize expenses. Many courts have concluded that while saving for retirement is certainly wise, "Congress, through its demanding standard, has chosen to give priority to the repayment of student loan debts." *Educ. Credit Mgt. Corp. v. Young*, 376 B.R. 795, 800 (E.D. Tex. 2007). *See also In re Gesualdi*, 505 B.R. 330, 341 (Bankr. M.D.N.C. 2004)(holding that an expenditure for retirement is not necessary to maintain a minimal standard of living). The most reasonable approach taken by the courts, and the one adopted by this Court, is that the determination of whether retirement contributions are reasonably necessary in this context is fact-intensive. For example, in the recent case of *In re Abney*, 2015 WL 6962925, *7 (Bankr. W.D. Mo. Nov. 10, 2015), the court concluded that the debtor should be afforded the opportunity to save at least something for retirement given that he made good faith efforts to make payments under his deferral agreements, made every "humanly-possible effort" to pay his

---

[8]Mrs. Johnson's pay stub reflects a deduction for a 401K plan.

child support and other obligations, maximized his earnings potential by working as much overtime as regulations permitted, and lived within a budget that was "exceptionally modest."

One of the facts often considered is the existence of a 401(k) plan. In most cases, a retirement contribution made in addition to a 401(k) monthly deduction is not necessary to maintain a minimal standard of living. *See, e.g., In re Perkins*, 318 B.R. 300 (Bankr. M.D.N.C. 2004). In this case, Mrs. Johnson's pay stubs reflect a regular deduction for a 401(k) plan. In light of this fact, and the fact that Mr. Johnson has not maximized his earning potential, nor has he or Mrs. Johnson made a single payment on their deferred loans, this Court finds that the "desired" retirement contribution of $100 is not necessary for the Debtors to maintain a minimal standard of living.

Also included in the Debtors' monthly budget is $100 for a "Desired Savings/Emergency Fund." The Debtors assert that its purpose is "[t]o save for emergency expenses [sic] i.e., tires, unexpected illness expenses, etc." Mr. Johnson drives a 1998 Dodge Ram pick-up truck with approximately 170,000 miles on it, while Mrs. Johnson drives a 2002 Nissan Sentra with 227,000 miles on it. The Debtors' budget includes a car payment of $400 in anticipation of the purchase of a vehicle for Mrs. Johnson. The Defendants take the position that this budget amount should be $0. The Court acknowledges that it is reasonable to expect that each of these vehicles will require significant repairs or replacement in light of their ages, and as a result, budgeting this amount for a car payment is not unreasonable. Given that the Debtors' budget also includes $35 for car maintenance, the total amount earmarked for transportation should be more than sufficient to cover the Debtors' automobile needs. The Court finds, therefore, that the $100 budgeted for emergencies, to the extent it is alleged to be necessary for vehicle repair or replacement, should be eliminated.

The Department of Education points out that the Debtors' Trial Memorandum shows a monthly cost of $88 for telephone and internet, and in addition, a monthly cost of $74 for cable/satellite. In the budget the Debtors introduced at trial, these expenses are lumped together as "Cable/home phone/internet" for $88/month. It is well established that in the context of the undue hardship analysis, cable is not a necessary expense. *See, e.g., In re Johnson*, 2014 WL 7011097, *4-5 (Bankr. W.D. Ark. Apr. 30, 2014)(citations omitted). No evidence was presented that delineated how much of the $88 was attributed to cable, if any. Since it appears that the $74 for cable was dropped from the amended budget, the Court has no objection to the $88 amount allotted for internet and phone-related services.[9]

The Debtors' proposed budget is lean. The line item differences between the Department of Education's suggested budget and the Debtors' actual budget are, for the most part, minimal. The Debtors' explanations as to any expense increases are plausible. Therefore, the Court concludes that the Debtors' proposed monthly budget of $2,706 should be adjusted to eliminate the Desired Retirement Contribution of $100 and the Desired Savings/Emergency Fund of $100, resulting in monthly expenses totaling $2,506.

### 3.  Other Relevant Facts and Unique Circumstances

The record reflects that both of the Debtors have several medical conditions. In particular, Mr. Johnson takes medication for hypothyroidism and gastroesophageal reflux disease on a daily basis. He also has sleep apnea which he treats by utilizing a special machine while he sleeps. Mrs. Johnson takes regular medication for high blood pressure, diabetes and rheumatoid arthritis. Both of the Debtors suffer from depression; Mr. Johnson takes medication daily for it, but Mrs. Johnson has stopped taking medication due to the cost. At trial, Mr. Johnson testified

---

[9]While it is possible that the expense for cable is included in the line item for Recreation/Entertainment, the Court does not find the budgeted amount of $60 excessive.

that as long as he takes his medication, his is fully capable of working.  In fact, when asked at his deposition if his ailments impact his ability to work in any way, Mr. Johnson admitted that they do not.  Mrs. Johnson presented no evidence demonstrating that her medical condition negatively affected her earning capacity.   The Court finds that the Debtors' medical problems do not impair to any significant extent their ability to work full-time and continue generating income.

### 4. The Income-Based Repayment Program

At trial, a loan analyst with the U. S. Department of Education testified that the government offers several repayment options for student loans, and that the Debtors would be eligible to participate in  its Income-Based Repayment Plan ("IBRP"), the terms of which are set out on its website.  She testified that the principal balance of the Student Loans is used to calculate the estimated monthly payment, and that the payment could be adjusted annually based on factors such as adjusted gross income ("AGI") and family size.  She also explained that the loans for both of the Debtors could be combined to calculate the estimated monthly payment.

The Debtors presented their case that they could not afford to make monthly payments under an IBRP, even at the minimum rate.  They testified about their attempts to use the Federal Student Aid website to calculate their estimated monthly repayments.  The Defendants' witness pointed out numerous errors the Debtors' made in their calculations in terms of their loan balances and reported income, and demonstrated that the Debtors' actual payment amount was lower than the one they had calculated.   At one point during trial, the Debtors claimed that they have been aware of a repayment option under which their monthly payment would be approximately $30 for 25 years.  They admitted that this "seems a reasonable amount," but took issue with the length of time. The Debtors argued that since only a portion of their debt would be paid over the 25-year period, they would suffer an enormous tax liability at the end based on

11

forgiveness of the balance of the indebtedness. This position is too speculative for consideration. *See In re Bray*, 332 B.R. 186, 198 (Bankr. W.D.Mo. 2005) (citing *In re Stanley*, 300 B.R. 813, 818 n.8 (N.D. Fla. 2003)("But it seems a stretch to assert that payment of students loans for 25 years under a federally approved program would create such a tax liability, even under today's tax laws. Forecasting such a tax liability under whatever tax laws will be in effect in 25 years would be shear speculation. Forecasting the effect any such liability would have on Ms. Stanley's actual standard of living at that time would be even more speculative.")).

Besides, as this Court reasoned previously, that the Debtors would end up with an "unconscionable financial burden" based on forgiveness of debt is not a certainty:

> First, pursuant to 26 U.S.C. §108(a)(1)(B), Debtor would only incur discharge of indebtedness income to the extent that the discharge renders him solvent, a result which is, at this point, impossible to predict. In addition, offers in compromise options are available to the Debtor and the IRS has the authority to forgive tax indebtedness if it doubts its collectability.

*Bray*, 332 B.R. at 198.

The Debtors stressed that they would be close to 80 years old at the end of the repayment period, and on a fixed retirement income. The Defendants countered that since the Debtors took out these Student Loans later in life, they should have expected that they would be making payments on them later in life, particularly since they requested deferments. This Court agrees. In *In re Winsborough*, 341 B.R. 14, 20 (Bankr. W.D.Mo. 2006), the debtor took out her original student loan when she was 45 years old in order to obtain a master's degree. Her additional loans were consolidated and payments deferred approximately 15 years later, making the debtor over 60 years old at the time of her "undue hardship" claim. This Court concluded that the mere fact that the debtor was near normal retirement age did not constitute a unique circumstance that

would justify the discharge of her student loans, and that she should have expected a repayment obligation after she was eligible for retirement:

> …Debtor requested forbearances for a total period of approximately 22 months, which requests were honored by the lender. Debtor should therefore have understood that the effect of those requests would be to either extend the length of the repayment period or increase the amount to be paid, including the amount of the required monthly payments, or both. As a result of having requested and received these deferments, Debtor might reasonably expect therefore to have been required to pay on this debt for longer than previously planned. It does not therefore seem unreasonable to suggest that Debtor should be required to continue to pay on her consolidated student loan and continue to work in order to generate the income necessary to make those payments.

(footnotes omitted). The same holds true for these Debtors. The Johnsons took out their Student Loans between 1985 and 2011, the last one being when they were close to 50 years old. Their argument that the Court should consider that they will be at post-retirement age at the conclusion of the repayment plan is not compelling.

Finally, the Defendants submitted into evidence estimates of the required IBRP payments based on a household of three, and a household AGI ranging from approximately $43,000 to approximately $53,000. They also submitted calculations of the Debtors' budget surplus using various iterations of their income and budget figures, taking into account the possibility of Mr. Johnson working full-time. In each case, the Debtors' monthly surplus was sufficient to make a monthly IBRP payment. The Court finds the Defendants' witness to be credible, and the amounts to which she testified reliable.

Analyzing the Debtors' ability to make IBRP payments was particularly challenging for the Court because the record contained multiple versions of the Debtors' financial position (both in terms of income and expenses). The figures the Debtors listed in Schedules I and J are different than those in their interrogatory answers, which are different than those in their trial

brief, which are different than those in their trial exhibits. While legitimate explanations were given for some of these discrepancies, the variances in the Debtors' numbers did cause the Court to have some concern about their credibility, and in particular, their minimization of expenses. Nevertheless, using the total net monthly income amount of approximately $2,900.74 (extrapolating from the Debtors' paystubs[10]), and the most recent expenses amount of $2,506 provided by the Debtors (as adjusted), the Court estimates the monthly budget surplus to be $394.74. The Debtors' approximate AGI is $50,000. According to the Defendants, the estimated IBRP payment assuming that approximate AGI, with three people in the household, is in the range of $190 to $278 per month. Therefore, the Debtors budget is sufficient to include a monthly IBRP payment. These calculations are based on Mr. Johnson's part-time employment. Obviously if he were to work full-time, as he is capable of doing, the Debtors' net monthly income would increase, as would the budget surplus.

### III.    CONCLUSION

Applying the totality of the circumstances standard, the Court concludes that the Debtors did not meet their burden of proving that repayment of their Student Loans would be an undue hardship such that they could not maintain a minimal standard of living. The evidence shows that the Debtors' income picture is not as bleak as they painted. Mr. Johnson is working part-time, but is capable of working full-time and has done so in the past. Mrs. Johnson did not account for the overtime pay that she frequently earns, and neither Debtor accounted for social security income. With respect to expenses, the evidence shows that they are likely to decrease

---

[10] If 401K contributions were not deducted from Mrs. Johnson's paychecks, she would earn on average $743.96 in net income on a bi-weekly basis according to the paystubs admitted into evidence. Multiplying that amount by 26 pay periods equals an estimated annual net income of $19,342.96. Dividing that amount by 12 equals an estimated monthly net income of $1,611.92. This amount plus Mr. Johnson's estimated monthly net income of $1,288.82 totals $2,900.74.

since the grandchild in their care should be able to care for himself in the near future, and the amounts set aside for a desired retirement contribution and emergency fund should be eliminated. The Debtors suffer from no severe medical conditions that would weigh in favor of discharging the debt. They have made no payments toward repaying the Student Loans despite the fact that they had a budget surplus sufficient to cover an IBRP payment. Finally, since the Debtors took out the loans when they were older and were granted a deferment, their expectation should have been that they would have to repay them later in life.

For all of the above reasons, the Court finds that repayment of the indebtedness owed by the Debtors to the Defendants would not be an undue hardship and, therefore, the debt is not discharged pursuant to 11 U.S.C. §523(a)(8). A separate Order will be entered in accordance with Bankruptcy Rule 9021.

Dated: December 18, 2015                     /s/  Dennis R. Dow
                                             THE HONORABLE DENNIS R. DOW
                                             UNITED STATES BANKRUPTCY JUDGE